DWAYNE JOHNSON *v.* COMMISSIONER
OF CORRECTION
(SC 16440)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

---

Argued April 24, 2001—officially released January 1, 2002

*Steven R. Strom,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellants (respondents).

*Scott B. Grover,* certified legal intern, with whom was *Timothy H. Everett,* for the appellee (petitioner).

*Opinion*

PALMER, J. This appeal requires us to decide whether Public Acts 1995, No. 95-255, § 1 (P.A. 95-255),[1] which

---

[1] Public Acts 1995, No. 95-255, provides in relevant part: "An Act Concerning Truth in Sentencing.

"Section 1. Subsection (b) of section 54-125a of the general statutes is

amended General Statutes (Rev. to 1995) § 54-125a[2] by
repealed and the following is substituted in lieu thereof:

"(b) (1) No person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole under subsection (a) of this section: Capital felony, as defined in section 53a-54b, felony murder, as defined in section 53a-54c, arson murder, as defined in section 53a-54d, murder, as defined in section 53a-54a, or any offense committed with a firearm, as defined in section 53a-3, in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school. (2) A PERSON CONVICTED OF AN OFFENSE, OTHER THAN AN OFFENSE SPECIFIED IN SUBDIVISION (1) OF THIS SUBSECTION, WHERE THE UNDERLYING FACTS AND CIRCUM-STANCES OF THE OFFENSE INVOLVE THE USE, ATTEMPTED USE OR THREATENED USE OF PHYSICAL FORCE AGAINST ANOTHER PERSON SHALL BE INELIGIBLE FOR PAROLE UNDER SUBSECTION (a) OF THIS SECTION UNTIL SUCH PERSON HAS SERVED NOT LESS THAN EIGHTY-FIVE PER CENT OF THE DEFINITE SENTENCE IMPOSED. (3) No person convicted of any other offense for which there is a mandatory minimum sentence which may not be suspended or reduced by the court shall be eligible for parole under subsection (a) of this section until such person has served such mandatory minimum sentence or fifty per cent of the definite sentence imposed, whichever is greater.

"Sec. 2. Section 54-125a of the general statutes is amended by adding subsection (c) as follows:

"(NEW) (c) The Board of Parole shall, not later than July 1, 1996, adopt regulations in accordance with chapter 54 to ensure that a person convicted of an offense described in subdivision (2) of subsection (b) of this section is not released on parole until such person has served eighty-five per cent of the definite sentence imposed by the court. Such regulations shall include guidelines and procedures for classifying a person as a violent offender that are not limited to a consideration of the elements of the offense or offenses for which such person was convicted.

"Sec. 3. This act shall take effect July 1, 1995, except that section 1 shall take effect July 1, 1996."

[2] General Statutes (Rev. to 1995) § 54-125a provides: "Parole of prisoner serving definite or aggregate sentence of more than two years. Eligibility. (a) A person convicted of one or more crimes who is incarcerated on or after October 1, 1990, who received a definite sentence or aggregate sentence of more than two years, and who has been confined under such sentence or sentences for not less than one-half of the aggregate sentence or one-half of the most recent sentence imposed by the court, whichever is greater, may be allowed to go at large on parole in the discretion of the panel of the Board of Parole for the institution in which the person is confined, if (1) it appears from all available information, including any reports from the commissioner of correction that the panel may require, that there is reasonable probability that such inmate will live and remain at liberty with-

increasing from 50 percent to 85 percent the portion of a sentence that certain violent offenders must serve before becoming eligible for parole, applies retroactively to those offenders who committed their offenses prior to the effective date of P.A. 95-255, § 1, and, if so, whether such retroactive application violates the ex post facto clause of the United States constitution.[3] The petitioner, Dwayne Johnson, brought this habeas corpus action against the respondents, the board of parole (board) and the commissioner of correction (commissioner),[4] claiming that his rights under the ex post facto clause were violated when the board, in

out violating the law, and (2) such release is not incompatible with the welfare of society. At the discretion of the panel, and under the terms and conditions as may be prescribed by the panel including requiring the parolee to submit personal reports, the parolee shall be allowed to return to his home or to reside in a residential community center, or to go elsewhere. The parolee shall, while on parole, remain in the legal custody and control of the board until the expiration of the maximum term or terms for which he was sentenced. Any parolee released on the condition that he reside in a residential community center may be required to contribute to the cost incidental to such residence. Each order of parole shall fix the limits of the parolee's residence, which may be changed in the discretion of such panel. Within three weeks after the commitment of each person sentenced to more than one year, the state's attorney for the judicial district shall send to the Board of Parole the record, if any, of such person.

"(b) No person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole under subsection (a) of this section: Capital felony, as defined in section 53a-54b, felony murder, as defined in section 53a-54c, arson murder, as defined in section 53a-54d, murder, as defined in section 53a-54a, or any offense committed with a firearm, as defined in section 53a-3, in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school. No person convicted of any other offense for which there is a mandatory minimum sentence which may not be suspended or reduced by the court shall be eligible for parole under subsection (a) of this section until such person has served such mandatory minimum sentence or fifty per cent of the definite sentence imposed, whichever is greater."

[3] Article one, § 10, of the constitution of the United States provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

[4] The petitioner's habeas petition did not initially name the board as a respondent. The petitioner subsequently filed a motion seeking to add the board as an additional respondent, which the habeas court granted.

applying P.A. 95-255, § 1, retroactively, denied him eligibility for parole until his completion of 85 percent, rather than 50 percent, of his sentence. The habeas court agreed with the petitioner's constitutional claim and rendered judgment ordering that the petitioner shall be eligible for parole consideration upon completion of 50 percent of his sentence.

On appeal, the respondents contend that the habeas court: (1) lacked subject matter jurisdiction over this action because the petitioner's claim gives rise to no cognizable liberty interest, which, according to the respondents, is a prerequisite to jurisdiction; and (2) improperly determined that the retroactive application of P.A. 95-255, § 1, violates the ex post facto clause. We conclude that the habeas court had jurisdiction over this action. We also conclude, however, that P.A. 95-255, § 1, applies prospectively only and, therefore, is not applicable to the petitioner's sentence. Although we disagree with the habeas court's conclusion that P.A. 95-255, § 1, applies retroactively, we nevertheless agree with the habeas court that the petitioner is eligible for parole consideration upon completion of 50 percent of his sentence. We, therefore, affirm the judgment of the habeas court.

The memorandum of decision of the habeas court sets forth the following undisputed facts and procedural history. "On November 10, 1995, the petitioner committed acts for which he was charged with the crimes of assault in the first degree [in violation of General Statutes § 53a-59],[5] carrying a pistol without a permit [in

---

[5] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and

violation of General Statutes (Rev. to 1995) § 29-35],[6] and reckless endangerment in the first degree [in violation of General Statutes § 53a-63].[7]

"The petitioner [pleaded] guilty to those [charges] on September 24, 1996. On November 12, 1996, he was sentenced to a total effective sentence of [fifteen] years [imprisonment], suspended after ten years . . . and three years probation. The petitioner has been in custody serving his sentence since that date.

"When the petitioner committed the crimes on November 10, 1995, the parole eligibility requirements set forth in [General Statutes (Rev. to 1995)] § 54-125a mandated that inmates serve 50 percent of their sentences before they could become eligible for parole consideration.

"[The] General Assembly amended [General Statutes (Rev. to 1995)] § 54-125a . . . [in] 1995 . . . . The new law[8] mandates that persons convicted of certain violent

thereby causes serious physical injury to another person; or (4) with intent to cause serious physical injury to another person and while aided by two or more other persons actually present, he causes such injury to such person or to a third person; or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm. . . ."

Although § 53a-59 has been amended since 1995, those amendments are not relevant to this appeal. We, therefore, refer to the current revision of § 53a-59 for convenience.

[6] General Statutes (Rev. to 1995) § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same . . . .

"(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit upon his person while carrying such pistol or revolver."

[7] General Statutes § 53a-63 provides in relevant part: "(a) A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person. . . ."

[8] General Statutes (Rev. to 1995) § 54-125a, as amended by P.A. 95-255, provides: "Parole of prisoner serving definite or aggregate sentence of more than two years. Eligibility. Regulations. (a) A person convicted of one or more crimes who is incarcerated on or after October 1, 1990, who received

crimes serve 85 percent of their sentences before becoming parole eligible.

a definite sentence or aggregate sentence of more than two years, and who has been confined under such sentence or sentences for not less than one-half of the aggregate sentence or one-half of the most recent sentence imposed by the court, whichever is greater, may be allowed to go at large on parole in the discretion of the panel of the Board of Parole for the institution in which the person is confined, if (1) it appears from all available information, including any reports from the Commissioner of Correction that the panel may require, that there is reasonable probability that such inmate will live and remain at liberty without violating the law, and (2) such release is not incompatible with the welfare of society. At the discretion of the panel, and under the terms and conditions as may be prescribed by the panel including requiring the parolee to submit personal reports, the parolee shall be allowed to return to his home or to reside in a residential community center, or to go elsewhere. The parolee shall, while on parole, remain in the legal custody and control of the board until the expiration of the maximum term or terms for which he was sentenced. Any parolee released on the condition that he reside in a residential community center may be required to contribute to the cost incidental to such residence. Each order of parole shall fix the limits of the parolee's residence, which may be changed in the discretion of such panel. Within three weeks after the commitment of each person sentenced to more than one year, the state's attorney for the judicial district shall send to the Board of Parole the record, if any, of such person.

"(b) (1) No person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole under subsection (a) of this section: Capital felony, as defined in section 53a-54b, felony murder, as defined in section 53a-54c, arson murder, as defined in section 53a-54d, murder, as defined in section 53a-54a, or any offense committed with a firearm, as defined in section 53a-3, in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school. (2) A person convicted of an offense, other than an offense specified in subdivision (1) of this subsection, where the underlying facts and circumstances of the offense involve the use, attempted use or threatened use of physical force against another person shall be ineligible for parole under subsection (a) of this section until such person has served not less than eighty-five per cent of the definite sentence imposed. (3) No person convicted of any other offense for which there is a mandatory minimum sentence which may not be suspended or reduced by the court shall be eligible for parole under subsection (a) of this section until such person has served such mandatory minimum sentence of fifty per cent of the definite sentence imposed, whichever is greater.

"(c) The Board of Parole shall, not later than July 1, 1996, adopt regulations in accordance with chapter 54 to ensure that a person convicted of an offense described in subdivision (2) of subsection (b) of this section is not

"[This state's] parole laws are discretionary and do not grant inmates the automatic right to demand or receive a parole hearing at any time.

"[Public Act 95-255, § 1, which implements] . . . the so-called '85 percent rule' became effective on July 1, 1996.

"The petitioner was notified by the [board in August, 1998] that he must serve 85 percent of his sentence before he will be considered for parole.

"[At the hearing on the petitioner's petition for a writ of habeas corpus], a supervisor with [the board's] hearing division . . . testified that the new standards were applied to the petitioner's case because he was sentenced after July 1, 1996 [for a crime or crimes committed after July 1, 1981]. [According to the supervisor], violent offenders sentenced after July 1, 1996 are considered as falling under the new law, while offenders sentenced before July 1, 1996, are treated under the prior law. [Under the board's interpretation of P.A. 95-255, an] inmate's date of sentencing, and not the date of his or her crime, controls this determination. There are more than 800 inmates in Connecticut's correctional system who, like the petitioner, were sentenced after July 1, 1996, for violent offenses committed before that date." *Johnson* v. *Warden,* Superior Court, judicial district of New London, Docket No. 99-0549240 (September 29, 2000) (28 Conn. L. Rptr. 279, 280).

After concluding that the retroactive application of P.A. 95-255, § 1, to the petitioner's sentence violated the petitioner's rights under the ex post facto clause, the habeas court ordered the board to "review the peti-

---

released on parole until such person has served eighty-five per cent of the definite sentence imposed by the court. Such regulations shall include guidelines and procedures for classifying a person as a violent offender that are not limited to a consideration of the elements of the offense or offenses for which such person was convicted."

tioner's eligibility for parole after he completes 50 percent of his sentence, in a manner consistent with the eligibility reviews accorded prior to July 1, 1996, to all other similarly situated inmates." Id. (28 Conn. L. Rptr. 283). The habeas court granted the respondents' petition for certification to appeal, and the respondents appealed to the Appellate Court. We then granted the commissioner's motion to transfer the appeal to this court pursuant to Practice Book § 65-2. Thereafter, this court ordered the parties to file supplemental briefs on the following issue: "In light of *Vincenzo* v. *Warden*, [26 Conn. App. 132, 599 A.2d 31 (1991)], did the trial court lack subject matter jurisdiction because the petitioner had no liberty interest in a claim for release on parole?"

On appeal, the respondents assert that: (1) because the petitioner has no right to parole, constitutional or otherwise, his claim does not give rise to a cognizable liberty interest and, consequently, the habeas court lacked subject matter jurisdiction over this action; and (2) the habeas court improperly determined that the retroactive application of P.A. 95-255, § 1, to the petitioner's sentence violated the ex post facto clause. The petitioner maintains that: (1) the habeas court had subject matter jurisdiction over this action; and (2) contrary to the conclusion of the habeas court, P.A. 95-255, § 1, has prospective application only. The petitioner further contends that, even if the habeas court properly concluded that the legislature intended that P.A. 95-255, § 1, would apply retroactively, the habeas court also properly concluded that such retrospective application violates the ex post facto clause. We conclude that the habeas court had jurisdiction over this action and, further, that P.A. 95-255, § 1, applies prospectively only.[9] Because the petitioner was sentenced for crimes *com-*

---

[9] Accordingly, we need not address the issue of whether the retroactive application of P.A. 95-255, § 1, violates the ex post facto clause.

*mitted* before the date on which P.A. 95-255, § 1, had taken effect, it is not applicable to the petitioner's sentence, and, therefore, the petitioner is eligible for parole consideration upon completion of 50 percent of his sentence.

## I

The respondents first contend that the habeas court lacked subject matter jurisdiction over this action because the petitioner's claim that he is eligible for parole after serving 50 percent of his sentence does not give rise to a protected liberty interest. We reject the respondents' claim.

We begin our analysis by noting that, "[u]nlike jurisdiction over the person, subject matter jurisdiction cannot be created through consent or waiver. . . . Once the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented. . . . The court must fully resolve it before proceeding further with the case. . . . Whenever a court finds that it has no jurisdiction, it must dismiss the case, without regard to previous rulings.

"We [next take] note of the basic purpose underlying what is one of the most extraordinary and unique legal remedies in the procedural armory of our law. . . . Although it is true that the United States Supreme Court has not always followed an unwavering line in its conclusions as to the availability of [t]he [writ of habeas corpus] . . . from the time the writ originated in seventeenth century England, its central purpose has been to test the legality of detention. English legislation and common law have been recognized by the United States Supreme Court as authoritative guides in applying the writ in the federal courts. *McNally* v. *Hill*, 293 U.S. 131, 136–37, 55 S. Ct. 24, 79 L. Ed. 238 (1934), overruled on other grounds, *Peyton* v. *Rowe*, 391 U.S. 54, 88 S. Ct. 1549, 20 L. Ed. 2d 426 (1968).

"In applying federal habeas statutes, the United States Supreme Court has said that [t]he purpose of the proceeding defined by the statute was to inquire into the legality of the detention . . . . There is no warrant in either the statute or the writ for its use to invoke judicial determination of questions which could not affect the lawfulness of the custody and detention, and no suggestion of such a use has been found in the commentaries on the English common law. *McNally* v. *Hill*, [supra, 293 U.S. 136–37]; see also *Engle* v. *Isaac*, 456 U.S. 107, 136, [102 S. Ct. 1558, 71 L. Ed. 2d 783] (1982) (Stevens, J., concurring in part and dissenting in part) (relief available to a prisoner only if he is held in custody in violation of the constitution or laws or treaties of the United States); *Preiser* v. *Rodriguez*, 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973) ([i]t is clear, not only from the language of [the federal habeas statutes], but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody); *Fay* v. *Noia*, [372 U.S. 391, 402, 83 S. Ct. 822, 9 L. Ed. 2d 837 (1963)] (writ's root principle is that in a civilized society, government must always be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release); [H. Hart & H. Wechsler, The Federal Courts and the Federal System (3d Ed. 1988) p. 1468] (Great Writ always serves the function of precipitating a judicial inquiry into a claim of illegality in the petitioner's detention for the purpose of commanding his release, or other appropriate disposition.); P. Bator, 'Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,' 76 Harv. L. Rev. 441, 444–45 (1963) ([i]ts function, in the great phrase, is to test the legality of the detention of one in the custody of another) . . . .

"The history of our own jurisprudence is wholly in accord with these principles. Habeas corpus provides a special and extraordinary legal remedy for illegal detention. . . . The deprivation of legal rights is essential before the writ may be issued. . . . Questions which do not concern the lawfulness of the detention cannot properly be reviewed on habeas corpus. . . . When a habeas petition is properly before a court, the remedies it may award depend on the constitutional rights being vindicated. . . . Further, any remedy must be commensurate with the scope of the constitutional violations that have been established." (Citations omitted; internal quotation marks omitted.) *Vincenzo* v. *Warden*, supra, 26 Conn. App. 135–38.

In *Vincenzo*, the petitioner, Dominic Vincenzo, filed a petition for a writ of habeas corpus, claiming that his confinement was illegal because the board had not complied with the rule-making provisions of the Uniform Administrative Procedure Act, General Statutes (Rev. to 1991) § 4-166 et seq., but, rather, had operated under its own procedures and regulations, which had not been approved by the attorney general or the legislature prior to implementation. Id., 134. Pursuant to those procedures and regulations, the board denied Vincenzo's application for parole. Id. The habeas court dismissed Vincenzo's "petition upon determining that [his] claimed right to [release on] parole was not an interest sufficient to give rise to habeas relief." Id., 133. The Appellate Court, in addressing the issue of whether the habeas court had subject matter jurisdiction to entertain Vincenzo's petition, sought to determine whether Vincenzo had a liberty interest, protected by the due process clause of the fourteenth amendment to the United States constitution,[10] in his release on

---

[10] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

parole. Id., 138; cf., e.g., *Hunt* v. *Prior*, 236 Conn. 421, 436, 673 A.2d 514 (1996) ("a plaintiff claiming due process protection under the Fourteenth Amendment must possess a property or liberty interest that is somehow jeopardized by governmental action" [internal quotation marks omitted]).

The Appellate Court acknowledged that, in *Greenholtz* v. *Inmates of the Nebraska Penal & Correctional Complex*, 442 U.S. 1, 11–12, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979), and *Board of Pardons* v. *Allen*, 482 U.S. 369, 377, 381, 107 S. Ct. 2415, 96 L. Ed. 2d 303 (1987) (*Allen*),[11] the United States Supreme Court held that the mandatory language in the parole statutes under review, both of which provided that a prisoner "shall" be released under certain conditions, gave rise to constitutionally protected liberty interests in parole release. *Vincenzo* v. *Warden*, supra, 26 Conn. App. 139–40. In reviewing General Statutes § 54-125,[12] the parole statute under which Vincenzo sought release on parole, however, the Appellate Court found no such mandatory language. Id., 141. Instead, the Appellate Court found that § 54-125 vested broad discretion in the board to

[11] Both *Greenholtz* and *Allen* involved actions brought pursuant to 42 U.S.C. § 1983 in which the plaintiffs alleged procedural due process violations. *Board of Pardons* v. *Allen*, supra, 482 U.S. 370–71; *Greenholtz* v. *Inmates of the Nebraska Penal & Correctional Complex*, supra, 412 U.S. 3–4.

[12] General Statutes § 54-125 provides in relevant part: "Any person confined for an indeterminate sentence, after having been in confinement under such sentence for not less than the minimum term, or, if sentenced for life, after having been in confinement under such sentence for not less than the minimum term imposed by the court, less such time as may have been earned under the provisions of section 18-7, may be allowed to go at large on parole in the discretion of the panel of the Board of Parole for the institution in which the person is confined, if (1) it appears from all available information, including such reports from the Commissioner of Correction as such panel may require, that there is reasonable probability that such inmate will live and remain at liberty without violating the law and (2) such release is not incompatible with the welfare of society. . . ."

determine *whether* a defendant should be considered for parole. Id. Consequently, the Appellate Court concluded that § 54-125 did not give rise to a cognizable liberty interest; id., 142; and, therefore, the habeas court properly had determined that it lacked subject matter jurisdiction over Vincenzo's claim. See id., 143.

Unlike Vincenzo, however, the petitioner in the present case is claiming a violation of his rights under the ex post facto clause as opposed to the due process clause.[13] The United States Supreme Court has recognized that "a law need not impair a 'vested right' to violate the ex post facto prohibition. Evaluating whether a right has vested is important for claims under the Contracts or Due Process Clauses, which solely protect pre-existing entitlements. . . . The presence or absence of an affirmative, enforceable right is not relevant, however, to the ex post facto prohibition, which forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred. Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." (Citations omitted.) *Weaver* v. *Graham*, 450 U.S. 24, 29–31, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981); see also *Lynce* v. *Mathis*, 519 U.S. 433, 445, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997) ("[the] retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the Ex Post Facto Clause because such cred-

---

[13] We, therefore, need not decide the jurisdictional issue considered by the Appellate Court in *Vincenzo*.

its are one determinant of [the] petitioner's prison term
. . . and . . . [the petitioner's] effective sentence is
altered once this determinant is changed" [internal quo-
tation marks omitted]).

The United States Supreme Court also has recognized
that "[t]he presence of discretion does not displace the
protections of the Ex Post Facto Clause." *Garner* v.
*Jones*, 529 U.S. 244, 253, 120 S. Ct. 1362, 146 L. Ed. 2d
236 (2000). Rather, "[t]he controlling inquiry . . . [is]
whether retroactive application of the change in [the]
law create[s] a sufficient risk of increasing the measure
of punishment attached to the covered crimes." (Inter-
nal quotation marks omitted.) Id., 250; see also id., 251
("[t]he question is whether the [new law] creates a
significant risk of prolonging [the inmate's] incarcera-
tion"). Thus, unlike a due process claim, "the . . .
focus [of which is] primarily on the degree of discretion
enjoyed by the [governmental] authority, not on the
estimated probability that the authority will act favor-
ably in a particular case"; (internal quotation marks
omitted) *Giaimo* v. *New Haven*, 257 Conn. 481, 508–509,
778 A.2d 33 (2001), quoting *Kelley Property Develop-
ment, Inc.* v. *Lebanon*, 226 Conn. 314, 323, 627 A.2d
909 (1993); the primary focus of an ex post facto claim is
the probability of increased punishment.[14] To establish a
cognizable claim under the ex post facto clause, there-
fore, a habeas petitioner need only make a colorable
showing that the new law creates a genuine risk that
he or she will be incarcerated longer under that new
law than under the old law. Having made a colorable
showing that he likely will serve more prison time as
a result of the extension of his parole eligibility date

---

[14] Of course, we recognize that the relative degrees of discretion enjoyed
by the governmental authority under the old law and under the new law
may be relevant in determining the probability of increased punishment
under the new law. The essential point, however, is that, even if the govern-
mental authority enjoyed broad discretion under the old law, that fact alone
would not necessarily foreclose a claim under the ex post facto clause.

from 50 percent to 85 percent of his sentence, the petitioner has established a cognizable claim of an ex post facto violation.[15] We, therefore, conclude that the habeas court had jurisdiction over the petitioner's habeas petition.

## II

We next must determine whether the 85 percent requirement of P.A. 95-255, § 1, applies retroactively. We agree with the petitioner that it does not.

"Whether to apply [P.A. 95-255, § 1] retroactively or prospectively depends upon the intent of the legislature . . . . In order to determine the legislative intent, we utilize well established rules of statutory construction. Our point of departure is General Statutes § 55-3, which states: No provision of the general statutes,[16] not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retrospective effect.

---

[15] We note that, although the United States Supreme Court has not addressed the precise issue before us, it has reviewed ex post facto claims in habeas appeals involving the issue of parole eligibility without first requiring the petitioner to establish that his claim gives rise to a protected liberty interest. See generally, e.g., *Lynce* v. *Mathis*, supra, 519 U.S. 435 (reviewing claim in habeas appeal that ex post facto clause was violated when old law authorizing early release credits based on jail overcrowding was superseded by new law that cancelled credits already received); *California Dept. of Corrections* v. *Morales*, 514 U.S. 499, 501–502, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995) (reviewing claim in habeas appeal that ex post facto clause was violated when new law authorizing board of prison terms to decrease frequency of parole suitability hearings applied retroactively to inmates serving sentences for crimes committed before enactment of law). Moreover, this court recently has indicated in dictum that the applicability of the amended parole eligibility requirements contained in P.A. 95-255, § 1, may be reviewed in habeas proceedings. See *State* v. *Faria*, 254 Conn. 613, 627 n.16, 758 A.2d 348 (2000).

[16] Although we are determining whether the legislature intended that P.A. 95-255, § 1, apply retroactively, the provisions found therein ultimately became part of the General Statutes and were codified at General Statutes (Rev. to 1997) § 54-125a (b).

The obligations referred to in the statute are those of substantive law. . . . Thus, we have uniformly interpreted § 55-3 as a rule of *presumed* legislative intent that statutes affecting *substantive* rights shall apply prospectively only. . . . This presumption in favor of prospective applicability, however, may be rebutted when the legislature clearly and unequivocally expresses its intent that the legislation shall apply retrospectively. . . . We generally look to the statutory language and the pertinent legislative history to ascertain whether the legislature intended that the amendment be given retrospective effect." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Andersen Consulting, LLP* v. *Gavin*, 255 Conn. 498, 517–18, 767 A.2d 692 (2001); accord *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 691–92, 755 A.2d 850 (2000). Furthermore, the presumption against retroactivity is reinforced by the maxim that penal statutes are to be construed strictly against the state. E.g., *State* v. *Scott*, 256 Conn. 517, 533, 779 A.2d 702 (2001); *State* v. *Pare*, 253 Conn. 611, 633–34, 755 A.2d 180 (2000). Finally, "to determine whether applying the [1995] amendment to the [petitioner] would constitute retroactive application of the amendment, we look to the law in effect on the date of [his] . . . offenses." *In re Daniel H.*, 237 Conn. 364, 378, 678 A.2d 462 (1996).

We turn first to the pertinent language of P.A. 95-255, § 1. Public Act 95-255, § 1, which is codified at General Statutes § 54-125a (b), provides in relevant part: "(2) A person convicted of an offense, other than an offense specified in subdivision (1) of this subsection, where the underlying facts and circumstances of the offense involve the use, attempted use or threatened use of physical force against another person shall be ineligible for parole under subsection (a) of this section until such person has served not less than eighty-five per

cent of the definite sentence imposed." The effective date of P.A. 95-255, § 1, is July 1, 1996. P.A. 95-255, § 3. General Statutes § 54-125a (b), which contains the foregoing language from P.A. 95-255, § 1, in subdivision (2), also provides in subdivision (1) that persons convicted of certain enumerated offenses committed on or after July 1, 1981, shall not be eligible for parole. See General Statutes § 54-125a (b) (1).

The respondents argue that "both the plain language of [P.A. 95-255, § 1] and the legislative history require that any offender [sentenced to incarceration] on or after July 1, 1996, [and] convicted of an offense committed on or after July 1, 1981 . . . 'shall be ineligible for parole' until that person has served 'not less than eighty-five percent of the definite sentence imposed.'" This interpretation, however, finds scant support in the relevant statutory language, which contains no reference to offenders sentenced to incarceration on or after July 1, 1996, or to offenses committed on or after July 1, 1981.

Public Act 95-255, § 1, amended General Statutes (Rev. to 1995) § 54-125a by dividing subsection (b) of § 54-125a into three subdivisions, the second of which contains the new 85 percent requirement. On the basis of that amendment, General Statutes § 54-125a (b) (2) simply provides that, effective July 1, 1996, "[a] person convicted of an offense . . . involv[ing] the use, attempted use or threatened use of physical force against another person shall be ineligible for parole . . . until such person has served not less than eighty-five per cent of the definite sentence imposed." Thus, unlike subdivision (1) of § 54-125a (b),[17] which clearly specifies that it applies to certain offenses committed on or after July 1, 1981, subdivision (2) of § 54-125a

---

[17] The language of § 54-125a (b) (1) formerly appeared in General Statutes (Rev. to 1995) § 54-125a (b). That language was not altered as a result of P.A. 95-255, § 1.

contains no reference either to the date of conviction or to the date of the offense.

To be sure, subdivision (2) of § 54-125a (b) applies to persons "*convicted* of an offense"; (emphasis added); involving the use, attempted use or threatened use of physical force. Contrary to the respondents' claim, however, we do not perceive this language as a clear and unequivocal statement by the legislature that P.A. 95-255, § 1, applies *retroactively* to persons convicted on or after the date on which the law became effective for offenses committed prior to that date. See, e.g., *In re Daniel H.*, supra, 237 Conn. 377–78 (date of offense is operative date for determining retroactivity of criminal statute). In our view, that language serves merely to identify those offenders who, by virtue of the violent nature of their offenses, are ineligible for parole until they have completed 85 percent of their sentence. There simply is no indication that the legislature's use of the term "convicted" was intended to have any broader implication. In the absence of any such indication, we must presume that the legislature intended P.A. 95-255, § 1, to apply prospectively, that is, to *offenses* committed on or after its effective date, not retroactively to offenses committed before the effective date, for which the offender is *convicted* on or after that date.

To the extent that the respondents rely on the language of § 54-125a (b) (1) to support their argument that § 54-125a (b) (2) applies to offenses committed on or after July 1, 1981, and not only to offenses committed on or after the effective date of P.A. 95-255, § 1, namely, July 1, 1996, that reliance is misplaced. General Statutes § 54-125a (b) (1) provides in relevant part that "[n]o person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole under subsection (a) of this section," and then lists the offenses for which parole may not

be granted. Contrary to the respondents' claim, there is nothing in the language of subdivision (1) to suggest that subdivision (2) also applies to offenses committed on or after July 1, 1981. Although subdivision (2) does refer to subdivision (1); see footnote 8 of this opinion; that reference exists simply to ensure that a person who has committed an especially serious offense that is enumerated in subdivision (1) is not eligible for parole *at any time* rather than upon completion of 85 percent of his or her sentence. Thus, the language of both subdivisions contains no indication that the 85 percent requirement of P.A. 95-255, § 1, was intended to apply to offenses committed before its effective date.

The respondents also contend that General Statutes § 54-125a (c) evinces an intent by the legislature to apply P.A. 95-255, § 1, retroactively. Specifically, the respondents argue that, because General Statutes § 54-125a (c) directs the board to adopt "guidelines and procedures for classifying a person as a violent offender that are not limited to the consideration of the elements of the offense or offenses for which such person was convicted," the legislature intended that the board would consider an inmate's past conduct and criminal history in determining the applicability of the 85 percent requirement. This argument also is unpersuasive. The issue before us is whether P.A. 95-255, § 1, applies retroactively to the *criminal conduct for which the petitioner was convicted.* The fact that the legislature contemplated possible legal consequences for *other* conduct that occurred prior to the effective date of P.A. 95-255, § 1, simply is irrelevant to that issue. In other words, because the prospective application of P.A. 95-255, § 1, is fully consistent with the purpose of § 54-125a (c), the latter has no bearing on whether the former has prospective or retrospective applicability.

Furthermore, the pertinent legislative history provides no clear indication that the legislature intended

that P.A. 95-255, § 1, would have retrospective effect. To the contrary, the majority of the legislative history suggests otherwise. For example, at a judiciary committee hearing regarding the proposed legislation that ultimately became P.A. 95-255, Thomas A. Siconolfi, then director of justice planning for the state office of policy and management, testified[18] in favor of the proposed legislation. Senator George C. Jepsen asked Siconolfi "how many prisoners out of the existing [prison] population . . . would be affected, would have their sentences affected by an [85 percent] goal?" Conn. Joint Standing Committee Hearings, Judiciary, Pt. 8, 1995 Sess., p. 2567. Siconolfi responded that "no offender who is in [prison] today would be affected . . . [b]ecause [the proposed legislation] would go into [e]ffect for *offenses committed* on or after October 1, 1995."[19] (Emphasis added.) Id. Siconolfi further testified

[18] "It is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation." (Internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 804, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998).

[19] Siconolfi and some of the legislators who discussed the proposed legislation during committee hearings and legislative proceedings refer to October 1, 1995, as the effective date of the legislation. E.g., 38 S. Proc., Pt. 8, 1995 Sess., p. 2856, remarks of Senator Thomas F. Upson. Contrary to such references, at no time did the draft bill carry a proposed effective date of October 1, 1995. We note, however, that General Statutes § 2-32 provides in relevant part that "[a]ll public acts, except when otherwise therein specified, shall take effect on the first day of October following the session of the General Assembly at which they are passed . . . ." It is likely, therefore, that, when the proposed legislation that subsequently became P.A. 95-255, § 1, was being debated, those participating in the debate simply assumed that the effective date of the legislation would be governed by § 2-32. Accordingly, the references to October 1, 1995, in the legislative history may be read to mean the effective date of the legislation.

We note, further, that the original version of the proposed bill that ultimately became P.A. 95-255 had an effective date of July 1, 1995. See Senate Bill No. 927, 1995 Sess. The bill subsequently was amended to include the language, now codified at subsection (c) of § 54-125a, which directs the board to adopt regulations for applying the 85 percent requirement. See Substitute Senate Bill No. 927, 1995 Sess. House Amendment A also changed

that the reason for limiting the 85 percent requirement of P.A. 95-255, § 1, to offenses committed on or after the legislation's effective date was that retroactive application of that provision to persons already incarcerated would increase the cost of maintaining the prison population to a level that the state would not be able to afford. Id.

At a subsequent hearing before the judiciary committee, Siconolfi, in response to a question by Representative Michael P. Lawlor, again testified that the proposed legislation "would apply to *offenses that are committed* on or after October 1, 1995[20] . . . ." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 10, 1995 Sess., p. 3573. Siconolfi also submitted written testimony to the judiciary committee on behalf of the office of policy and management in which he stated that that office has "taken steps in crafting [this legislation] to ensure that the effects of longer sentences on the prison system are minimized, and therefore would not cause a return to the overcrowding and early releases of the [1980s]. As written, this legislation *would apply to offenses committed on or after October 1, 1995*[21] and consequently would have no impact on the [current state] budget."[22] (Emphasis added.) Conn. Joint

the effective date of what later became General Statutes (Rev. to 1995) § 54-125a (b), as amended by P.A. 95-255, § 1 (implementing 85 percent requirement), to July 1, 1996. The addition of subsection (c) to General Statutes (Rev. to 1995) § 54-125a; see P.A. 95-255, § 2, became effective July 1, 1995. It is reasonable to assume that the effective date of the 85 percent requirement was changed to July 1, 1996, to afford the board a period of one year—from July 1, 1995, to July 1, 1996—to establish new regulations for implementation of the 85 percent requirement.

[20] See footnote 19 of this opinion.

[21] See footnote 19 of this opinion.

[22] We note that the legislative bill file in the Connecticut state library contains a "fact sheet" from the office of policy and management stating that the proposed legislation would have no fiscal impact for fiscal years 1995–96 and 1996–97 "provided the changes apply only to persons *convicted of* the enumerated offenses on or after October 1, 1995." (Emphasis added.) In view of Siconolfi's unambiguous oral and written testimony and the representation contained in the fact sheet that the legislation would have

Standing Committee Hearings, Judiciary, Pt. 12, 1995 Sess., pp. 3986–87.

Thereafter, during the Senate debate on the proposed legislation, Senator Jepsen, after suggesting that the legislation would be more effective if it were to be implemented immediately, asked a proponent of the legislation, Senator Thomas F. Upson: "Are you aware of any effort by the current administration to implement this [legislation] now as opposed to only on future sentences?" 39 S. Proc., Pt. 8, 1995 Sess., p. 2856. Senator Upson responded as follows: "This [legislation] will take effect on those crimes after [October 1, 1995].[23] Therefore, there's no need for a fiscal note. . . . It's not giving you the answer you want, but that's my understanding." Id., pp. 2856–57. Senator Jepsen then indicated that he could not support the bill because "it doesn't affect anybody currently in prison. What it is designed to do is to affect only those who would be convicted at some future date . . . ."[24] Id., p. 2863.

no fiscal impact for fiscal years 1995–96 and 1996–97, however, it is reasonable to assume that the office of policy and management's use of the phrase "convicted of," rather than the phrase "commission of," simply was a mistake.

Moreover, the legislative bill file contains a fiscal impact statement submitted by the legislature's office of fiscal analysis regarding the proposed legislation that ultimately became P.A. 95-255. After explaining why the legislation would result in "potential significant [long-term] cost to the criminal justice system," the fiscal impact statement provided that "[p]assage of th[is] [legislation] would result in inmates serving greater percentages of their sentences and subsequently increasing the workload for the [d]epartment of [c]orrection. The state is presently below its prison capacity and with declining crime trends and the fact that *this legislation affects only new violent offenders*, it is anticipated that such gradual increasing of the [d]epartment's workload can be absorbed within existing resources." (Emphasis added.) Although the fiscal impact statement contains an express caveat that it " 'does not represent the intent of the General Assembly or either house thereof for any purpose,' " the statement nevertheless is instructive insofar as it is corroborative of the observations of the office of policy and management regarding the application and fiscal impact of the proposed legislation.

[23] See footnote 19 of this opinion.

[24] Senator Jepsen went on to explain that, in his view, the proposed legislation was "fiscally irresponsible" because it would "saddle future administra-

Although the foregoing legislative history bolsters the petitioner's claim that P.A. 95-255, § 1, applies prospectively only, at least one representative believed that the legislation would be applied retrospectively. Specifically, Representative Lawlor stated during the floor debate on the proposed legislation in the House of Representatives that it "does not wait five or six years to have an effect. This bill will also [a]ffect all of the people currently incarcerated in Connecticut's prisons. If they meet these violent guidelines, they will not get a parole hearing when they think they are going to get it.

"So it will have an immediate [e]ffect and the message will go out, not six years from now, but probably tomorrow that things have changed in Connecticut's prisons."[25] 38 H.R. Proc., Pt. 12, 1995 Sess., p. 4224. In the

tions and future legislatures with the cost that we are unwilling to [under]take today." 39 S. Proc., supra, p. 2864.

We note that, at one point during the Senate debate on the proposed legislation, Senator Upson stated that, "even though [the office of policy and management] has given . . . a statement . . . that as long as . . . the changes apply . . . [to] person[s] *convicted* on or after October [1, 1995], there will be no cost for [fiscal year] 95–96 or 96–97 . . . in the future, after that, there is a potential . . . cost . . . [because] there's no question there will be people staying in prison for a longer period of time." (Emphasis added.) Id., p. 2862. Senator Upson's statement, if taken out of context, tends to support the respondents' claim that the 85 percent requirement would apply to persons *convicted* of crimes on or after the effective date of the legislation as opposed to persons who are imprisoned for *committing* crimes on or after that date. As we previously have indicated, however, the statement of the office of policy and management to which Senator Upson adverts does not accurately reflect the position of that office regarding the effective date of the legislation. See footnote 19 of this opinion. Moreover, because Senator Upson simply was referring to the statement of the office of policy and management in responding to a question about the projected cost of the proposed legislation, we do not read his testimony as reflecting his view regarding the application of the proposed legislation to sentences imposed for the commission of crimes before the effective date.

[25] It appears that, under Representative Lawlor's understanding of the proposed legislation, it would be fully retroactive to all incarcerated offenders, including those who committed violent offenses on or after July 1, 1981. This view differs from that espoused by the respondents, who contend that P.A. 95-255, § 1, applies only to persons *convicted* on or after the effective date of July 1, 1996, for offenses *committed* on or after July 1, 1981.

absence of any clear statutory language to support this interpretation of the legislation, however, and in light of the other pertinent legislative history, Representative Lawlor's comments are insufficient to overcome the strong presumption against retroactivity. See, e.g., *In re Daniel H.*, supra, 237 Conn. 376.

Our determination that P.A. 95-255, § 1, does not apply retroactively also finds support in the canon of statutory construction that statutes generally are to be interpreted to avoid, rather than to create, constitutional questions. Cf. id., 378 n.10. In the present case, a retroactive application of P.A. 95-255, § 1, would raise concerns about its constitutionality insofar as such application arguably makes the punishment for a crime more burdensome after its commission and, therefore, might run afoul of the ex post facto clause.[26] See, e.g., *Garner* v. *Jones*, supra, 529 U.S. 250 (controlling inquiry for ex post facto claim is whether retroactive application of new law creates "a sufficient risk of increasing the measure of punishment" associated with covered crimes [internal quotation marks omitted]).

Finally, applying P.A. 95-255, § 1, retroactively would lead to incongruous results. The following hypothetical example illustrates this potential incongruity. Offender A and offender B commit the same violent crime on July 1, 1995, one year before the effective date of P.A. 95-255, § 1. Offender A is tried, found guilty and sentenced prior to July 1, 1996. Although offender B is ready and willing to commence trial prior to July 1, 1996, due to systemic delays wholly unrelated to offender B's case, he is not tried and convicted until after July 1, 1996. Under the statutory interpretation urged by the respondents, offender A is eligible for parole upon completion

---

[26] As we have indicated, however; see footnote 9 of this opinion; we intimate no view on the issue of whether retroactive application of P.A. 95-255, § 1, violates the ex post facto clause.

of 50 percent of his sentence because he was convicted before the effective date of P.A. 95-255, § 1. On the other hand, offender B is ineligible for parole until he serves 85 percent of his sentence because he was convicted after the effective date of P.A. 95-255, § 1. It is unlikely that the legislature would have intended for two similarly situated offenders to receive such disparate treatment based solely on the fortuity of when their cases came to trial. See, e.g., *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 499–500, 709 A.2d 1129 (1998) (if two constructions of statute are possible and one alternative produces likelihood of untenable or irrational results, more reasonable interpretation should be adopted).

For the foregoing reasons, we conclude that the respondents have failed to establish that the legislature intended P.A. 95-255, § 1, to have retroactive effect. Inasmuch as the 85 percent requirement of P.A. 95-255, § 1, is not applicable to persons like the petitioner, who committed offenses prior to July 1, 1996, we agree with the habeas court that the petitioner is eligible for parole consideration after he has completed 50 percent of his sentence.[27]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[27] The respondents alternatively claim that, even if P.A. 95-255, § 1, does not apply retroactively, application of P.A. 95-255, § 1, to persons who, like the petitioner, committed offenses after the date on which the legislation was passed but prior to its effective date, simply is not a retroactive application of the legislation. We disagree with this unsupported assertion. As we previously have indicated, a law is retroactive if it "changes the legal consequences of acts completed before its *effective date.*" (Emphasis added.) *Weaver* v. *Graham*, supra, 450 U.S. 31.