******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ALBERT KALIL
(SC 19016)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Vertefeuille, Js.

*Argued March 27—officially released November 25, 2014*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, was *Peter A. McShane*, state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Albert Kalil, appeals from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of one count of burglary in the third degree in violation of General Statutes § 53a-103 (a)[1] and one count of larceny in the second degree in violation of General Statutes (Rev. to 2009) § 53a-123 (a).[2] The defendant claims the Appellate Court improperly concluded that (1) the trial court did not abuse its discretion in permitting the state to introduce evidence of the defendant's uncharged misconduct to prove his intent to commit the charged crimes, and (2) Public Acts 2009, No. 09-138, § 2 (P.A. 09-138),[3] which amended the second degree larceny statute after the defendant committed the crime but before his conviction by increasing the value of property stolen necessary to constitute the offense, did not apply retroactively. We affirm the judgment of the Appellate Court.

The following relevant facts, which the jury reasonably could have found, are set forth in the Appellate Court's opinion. "At approximately 10 a.m. on January 27, 2009, Judith Stanton left her home located at 677 Pequot Trail in [the town of] Stonington (Stonington property). When Stanton returned at approximately noon, she realized that the telephone was no longer on the wall, the liquor cabinet was open and drawers had been opened in every room upstairs. Her jewelry box had been 'torn apart,' and pocket watches that were on display in a cabinet were missing. Jewelry, several $2 bills, a federal note and six $100 bills were [also] missing from the property.

"Lucinda Wesson, a resident of 672 Pequot Trail in Stonington lives directly across from the Stonington property. On the morning of January 27, 2009, she noticed a car she did not recognize parked on her street. It was a dark colored convertible Saab with . . . Massachusetts license plate[s]. At that time, no one was in or near the car. Some time later, Wesson went to the other side of her home, and she again saw the car because it was stationed outside of her property. At this time, the passenger's side door was open, and a man was wandering in the middle of the street, appearing as if he were looking for something. The person driving the car told the passenger to get in the car, and the parties then left. Each of the individuals had a 'very thick Massachusetts accent.' From her standpoint in her home, she believed the individual outside of the vehicle was approximately six feet tall, and she apprised police that he was of Italian descent, with black hair, between forty and fifty years old, approximately 200 pounds and wearing a red sweatshirt type of jacket.

"An investigation at the Stonington property revealed that force had been used to open the rear door. An area

of weather stripping that ran down the exterior of the door had been manipulated or moved. The damage was consistent with forced entry into the house. There were footprints in the snow outside the Stonington property that ran from the front of the home to the back door; however, the police were not able to get foot impressions. The Stonington police filed a report with the National Crime Information Center detailing the incident.

"On January 27, 2009, at approximately 1:45 p.m., Raymond Driscoll, the police chief in Richmond, Rhode Island, drove past the home of an acquaintance located at 122 Kingston Road in Richmond (Rhode Island property). The homeowner's truck was not on the property; however, there was a black Saab convertible with Massachusetts license plates parked in the yard. Driscoll observed two men standing in front of the garage door looking into the garage through a window. He then observed one of the men looking through a door at the front step next to the garage. This man was 'alternately looking over his shoulder between looking into the house.' One of the men noticed that Driscoll was watching, and both men quickly walked to the Saab and drove away.

"Driscoll followed the vehicle, which pulled into an abandoned gasoline station parking lot. While Driscoll was calling for additional police support, the operator of the vehicle got out of the car and walked over to him. Driscoll asked the operator for his license and registration, which he retrieved. The license identified the operator of the vehicle as [Joseph] Cote, and his passenger was identified as the defendant. Cote volunteered that he and the defendant were on their way from [a] casino and had gotten lost. Cote stated that they had stopped at the house to ask for directions and that they were running out of gasoline. Driscoll asked Cote to turn the vehicle on, and Driscoll observed that the vehicle had more than one quarter of a tank of gas remaining.

"The defendant was wearing a 'sweatshirt type jacket,' and he had a pair of blood-stained, white athletic socks in his jacket pockets. There was also a cut on the defendant's hand. When asked why he had socks in his jacket pocket, the defendant responded that he had 'bad feet.' The defendant stated that he and Cote were at [a] casino, and he had won $100. When asked why he was at the Rhode Island property, the defendant stated they were lost and running out of gasoline and had stopped to ask for directions. When asked how they could be running out of gasoline when there were four gasoline stations within a mile and one quarter of where they were located, the defendant responded that he did not know. When asked why they chose to stop at the Rhode Island property and ask for directions when there were no cars in the driveway, the defendant

responded that he did not know.

"After obtaining Cote's consent, Driscoll searched the vehicle, finding some articles of clothing in the backseat, a pair of black gloves on the center console and a screwdriver, a pry bar and a hatchet/hammer in the trunk. When the additional police support arrived, Driscoll went back to the [Stonington property] and noticed two sets of footprints in the snow leading from the front of the home to the rear of the home and back to the front. He could see where an individual had stopped on the back step and presumably looked into the house through the back door. There did not appear to be any entry into the house.

"Driscoll placed the defendant in the backseat of an officer's cruiser and asked Cote to follow him to the police station. He pulled into the parking area behind the station, and Cote pulled up to the front of the station. After parking, Driscoll went to the front of the police station, and 'Cote was standing on the sidewalk in front of the Saab . . . right in front of a row of small shrubbery that's in front of the police station.' Driscoll again obtained consent to search Cote's vehicle, and he seized the hatchet/hammer, screwdriver and pry bar. When looking through the interior of the vehicle, the police seized a costume jewelry gemstone. The gemstone was approximately one-quarter inch by one-quarter inch in size and blue or green in color. It was found between the driver's seat and the passenger's seat in the Saab.

"The Richmond police later recovered a bag from the bushes in front of the Saab that was parked in the police department parking lot. Inside the bag, there were various types of jewelry, including pocket watches, rings and bracelets. The bag contained approximately fifty pieces of jewelry. The bag also had a piece of jewelry with gemstones that matched the gemstone found inside the vehicle.

"The Stonington police were notified that the Richmond [P]olice [D]epartment had found individuals and goods that were consistent with the Stonington burglary. [Stanton and her husband, Richard Stanton] viewed the jewelry obtained by the Richmond [P]olice [D]epartment and identified it as their property. The defendant and Cote thereafter were arrested by the Stonington police and charged with burglary in the third degree and larceny in the second degree.

"The jury found the defendant and Cote guilty of [the offenses charged]. The defendant was sentenced to a total effective sentence of nine years incarceration." (Footnotes omitted.) *State* v. *Kalil*, 136 Conn. App. 454, 456–61, 46 A.3d 272 (2012).

The defendant appealed from the judgment of conviction to the Appellate Court,[4] claiming, inter alia, that the trial court improperly had admitted Driscoll's testimony regarding what he had observed on the Rhode Island

property. Id., 456. The defendant claimed that the testimony was not relevant, was not required to complete the story of the burglary and the arrest of the defendant, and did not prove the defendant's intent. Id., 461. He further claimed that the testimony served only as evidence of his allegedly bad character, and, therefore, it was unduly prejudicial. Id. The Appellate Court rejected the defendant's claims and determined that the testimony had been properly admitted to prove the defendant's intent to commit the burglary. Id., 465. The court thus found it unnecessary to decide whether the testimony had been properly admitted to complete the story of the burglary. Id., 469 n.13. Thereafter, we granted the defendant's petition for certification to appeal. *State* v. *Kalil*, 307 Conn. 902, 53 A.3d 217 (2012). We also granted the defendant's subsequent motion for permission to raise the issue of whether P.A. 09-138, § 2, which amended the second degree larceny statute to increase the value of property stolen necessary to constitute the offense, applied retroactively. See *State* v. *Kalil*, 307 Conn. 955, 59 A.3d 1191 (2013). We conclude that Driscoll's testimony was properly admitted and that P.A. 09-138 did not apply retroactively. We therefore affirm the judgment of the Appellate Court.

I

We begin with the defendant's claim that the trial court improperly admitted Driscoll's testimony regarding the defendant's misconduct in Rhode Island under the commonly relied on intent exception to the bar against admission of other misconduct evidence. The defendant claims that there is little to distinguish intent from propensity and that Driscoll's testimony was inadmissible because it could prove only the defendant's alleged propensity to commit certain criminal acts. The state responds that the trial court properly admitted Driscoll's testimony because it was relevant to show the defendant's intent to participate with Cote in unlawfully entering the Stantons' home to deprive them of their property. We agree with the state.

The following additional facts are set forth in the Appellate Court's opinion. "Prior to trial, defense counsel filed a motion in limine to bar Driscoll's testimony about any observations that he made prior to stopping the defendant and Cote in Rhode Island on January 27, 2009. Counsel argued that allowing Driscoll to testify as to the nature of the incident he observed would be extremely prejudicial to the defendant, as the defendant was not charged for that incident, and it was separate from the charges in Connecticut. The state, in turn, argued that the testimony would complete the story of the Stonington burglary and demonstrate the defendant's intent to commit . . . [that] burglary. The court determined that the testimony was admissible to complete the story . . . [and also] was relevant to the defendant's intent. The court therefore denied the

motion in limine.

"After Driscoll testified as to his observations of the defendant prior to stopping the Saab, the court gave a limiting instruction . . . directing the jury to consider such testimony only if it determined that the conduct occurred and that it supported the issue of intent or completing the story.[5] Similarly, during its charge to the jury after closing arguments, the court again instructed the jury that it could consider this portion of Driscoll's testimony only if it concluded that it demonstrated the defendant's intent during the Stonington burglary or if it completed the story of the Stonington burglary."[6] (Citation omitted; footnote altered.) *State* v. *Kalil*, supra, 136 Conn. App. 461–62.

We begin with the standard of review and the governing legal principles. "Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Pena*, 301 Conn. 669, 673–74, 22 A.3d 611 (2011).

On the issue of relevance, we have stated that "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . The trial court has wide discretion to determine the

relevancy of evidence and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 23, 1 A.3d 76 (2010).

In the present case, the defendant was charged with third degree burglary and second degree larceny. Under the third degree burglary statute, the state was required to prove that the defendant entered or remained unlawfully in the Stanton residence with an intent to commit a crime. See General Statutes § 53a-103 (a). Under the second degree larceny statute, the state was required to prove, inter alia, that the defendant, with the intent to deprive another person of property or to appropriate the property to himself or a third person, wrongfully took, obtained, or withheld such property from its owner. See General Statutes § 53a-119; see also General Statutes § 53a-123 (a) (referring to § 53a-119). Thus, proof of the element of intent was essential to the defendant's conviction of both crimes.

The defendant claims that Driscoll's testimony was not relevant for two reasons. He first claims that "[t]he best limiting principle on the admission of uncharged misconduct as proof of intent is . . . remarkable similarity" and that, because there was no proof that he, rather than Cote, burglarized the Stanton home, his alleged misconduct on the Rhode Island property was not relevant or probative of his alleged misconduct in Stonington. He notes that there was only one set of unidentified footprints in the snow going from the front of the Stanton home to the back door, there was only one person seen standing next to the Saab, and there was no other direct evidence of his involvement in the burglary in Stonington. In other words, the defendant claims that Driscoll's testimony lacked the factual predicate for admission because there was no basis from which the jury could infer that when the defendant and Cote exited the parked car across the street from the Stonington property, they did so jointly with the intent of seeking entry for the purpose of burglarizing the Stanton home. The defendant's second claim is that, even if Driscoll's testimony was relevant to the act of breaking into the Stanton home, it had no bearing on whether the defendant intended to steal the Stantons' property once he got inside. We disagree.

It is well established that "there is no legal distinction between direct or circumstantial evidence so far as its probative force is concerned." *State* v. *Benton*, 161 Conn. 404, 410, 288 A.2d 411 (1971); see also *State* v. *Sinclair*, 197 Conn. 574, 576, 500 A.2d 539 (1985) ("it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct"); *State* v. *Kohlfuss*, 152 Conn. 625, 639, 211 A.2d 143 (1965) ("[t]he fact that

no one actually saw [the defendant] or his companion breaking into, or out of, the building, entering it, or even within it, would not preclude a conviction for statutory burglary if the circumstantial evidence was strong enough to prove guilt of the crime charged beyond a reasonable doubt"). Accordingly, the lack of any direct evidence that the defendant was on the Stonington property does not mean that no factual predicate existed for the trial court's admission of Driscoll's testimony, as long as there was other circumstantial evidence of his involvement in the charged crimes.

Applying this principle, we are persuaded, based on our review of the record, that there was sufficient circumstantial evidence of the defendant's intent to participate in the Stonington burglary to serve as the factual predicate for the trial court's admission of Driscoll's testimony regarding the defendant's uncharged misconduct in Rhode Island. The Stonington evidence included (1) Wesson's initial observation of an unfamiliar, dark colored Saab convertible with Massachusetts license plates parked across the street from the Stanton home, which was then unoccupied, with no one in or around the vehicle, (2) footprints in the snow going from the front of the Stanton home to the back door, (3) weather stripping on the back door that had been manipulated or moved, leaving damage consistent with a forced entry, (4) Wesson's subsequent observation of a man sitting in the driver's seat of the Saab convertible with the passenger door open and another man in the middle of the street, apparently looking for something, before they drove away, and (5) the discovery of tools that could have been used in a forcible entry of the Stanton home, including a screwdriver and a pry bar, and the finding of a gemstone, similar to a gemstone missing from a piece of the stolen jewelry, in the black Saab convertible with Massachusetts license plates that Cote and the defendant were driving in Rhode Island.

The defendant nonetheless contends that, under *State* v. *Baldwin*, 224 Conn. 347, 618 A.2d 513 (1993), and *State* v. *Randolph*, 284 Conn. 328, 933 A.2d 1158 (2007), Driscoll's testimony had little relevance or probative value because the charged and uncharged crimes were not remarkably similar. Neither *Baldwin* nor *Randolph* suggests, however, that the uncharged crime must be remarkably similar to the charged crime in order to be relevant. Rather, *Baldwin* discussed the principle of remarkable similarity only in considering the heightened probative value of uncharged misconduct evidence *following* a determination that such evidence was relevant to prove the charged offense. See *State* v. *Baldwin*, supra, 355 (fact that other misconduct evidence "was remarkably similar both in kind and location" to evidence of charged crime made other misconduct evidence "that much more probative"), citing *United States* v. *Jones*, 913 F.2d 1552, 1566 (11th Cir. 1990), and *United States* v. *Dunbar*, 614 F.2d 39, 42

(5th Cir.), cert. denied, 447 U.S. 926, 100 S. Ct. 3022, 65 L. Ed. 2d 1120 (1980).

*Randolph* also is inapposite because the passage in *Randolph* cited by the defendant addressed the ways in which uncharged misconduct evidence could be used to establish the existence of a common plan or scheme, which is not the issue in the present case. *State* v. *Randolph*, supra, 284 Conn. 356. Furthermore, the defendant cites only that portion of the analysis in *Randolph* favorable to his position. This court stated in *Randolph* that, although uncharged misconduct evidence may be introduced to prove a common plan or scheme if there are marked similarities between the charged and uncharged crimes, uncharged misconduct evidence also may be introduced when there is *no* marked similarity between the crimes, but "the nature of the charged and uncharged crimes, combined with connecting evidence, if any . . . give[s] rise to an inference that a common scheme or plan existed." Id. Thus, in addition to the fact that *Randolph* did not address the issue of intent, as it is raised in this appeal, the defendant ignores this court's recognition in *Randolph* that marked similarities are not necessarily required even when there is an attempt to prove the existence of a common plan or scheme.

We also disagree with the defendant's second claim regarding relevance, which is that, even if Driscoll's testimony was somewhat relevant to the act of breaking into the Stanton home, it had no bearing on whether the defendant intended to steal the Stantons' property once he got inside. We stated in *State* v. *Zayas*, 195 Conn. 611, 490 A.2d 68 (1985), that "[c]ommon experience tells us that an unlawful entry into a dwelling . . . is not without purpose. Nor are people accustomed to enter[ing] homes of strangers [unlawfully] . . . for innocent purposes. To any person of ordinary intelligence, the expected [byproduct] of a surreptitious unlawful entry into the home of another is theft." Id., 617. We thus concluded in *Zayas* that "two sets of pry marks on the window sill bespeak criminal purpose." Id., 618. Likewise, in the present case, footprints in the snow leading to the back door of the Stanton home, damage to the back door consistent with a break-in, a gemstone discovered in the Saab convertible matching a gemstone missing from a piece of the stolen jewelry, and other circumstantial evidence connected with the burglary were indicative of a break-in and an intent to steal. See, e.g., *State* v. *Spikes*, 111 Conn. App. 543, 557, 961 A.2d 426 (2008) (evidence of footprints matching defendant's boots in direction of and inside screened in porch, partial removal of screen door, and damage to window of dwelling allowed jury to find that defendant forcibly entered dwelling and to infer that defendant intended to commit burglary and larceny), cert. denied, 290 Conn. 901, 967 A.2d 114, cert. denied, 558 U.S. 898, 130 S. Ct. 249, 175 L. Ed. 2d 170 (2009).

Moreover, the foregoing evidence was not the only evidence of the defendant's intent to steal once he was inside the Stanton home. We have stated that evidence of conduct subsequent to the commission of a crime also may be admissible to prove intent. See, e.g., *State* v. *Croom*, 166 Conn. 226, 230, 348 A.2d 556 (1974) ("evidence of the conduct of a defendant subsequent to the commission of a crime is admissible to show the defendant's state of mind at the time of the crime . . . [and] is simply an application of the general principle that an individual's conduct may constitute evidence of his mental state"). In the present case, the defendant's misconduct in Rhode Island, which takes on added significance because it occurred only a few hours after the Stonington burglary, is just as probative of the defendant's intent to steal from the Stanton home as the evidence found on the Stonington property and inside the Saab convertible. Driscoll observed the defendant and Cote peering surreptitiously into the garage through a window and a door, one of the men repeatedly looking over his shoulder while he was peering into the house, and both men walking back to the Saab convertible and driving away after they noticed Driscoll watching. See, e.g., *State* v. *Sinclair*, supra, 197 Conn. 578 ("[The defendant's] unlawful and surreptitious presence in the student suite and closet, [and] his flight and his struggle with the police upon his apprehension are all indicative of criminal purpose. The jury was entitled to apply its own knowledge and experience of human nature to this evidence . . . and to infer therefrom that the defendant was not merely trespassing." [Citation omitted.]); *State* v. *Perry*, 195 Conn. 505, 522, 488 A.2d 1256 (1985) (evidence of several robberies in area where crime occurred in which defendant and others participated "was very probative on the issue of the defendant's state of mind, tending to negate his claims of duress and ignorance of his companion's criminal intent"). We therefore conclude that Driscoll's testimony was relevant and probative to prove the defendant's intent to steal once he got inside the Stanton home.

In insisting that Driscoll's testimony had no bearing on whether the defendant intended to steal once he got inside the Stanton home, the defendant relies primarily on *State* v. *Meehan*, 260 Conn. 372, 796 A.2d 1191 (2002), in which we drew a distinction between "using [other misconduct] evidence to prove an act and using [such] evidence to prove intent . . . ." Id., 396. The defendant claims there is no meaningful distinction between *Meehan* and the present case because both involved testimony regarding other misconduct by the defendant to prove his specific intent, and, in both cases, the testimony proved only the defendant's alleged propensity to commit certain criminal acts. We disagree.

In *Meehan*, the defendant, a police officer who was

convicted of larceny for stealing money from a drug suspect, Manuel Villarmarin, during the course of a patdown search, challenged the admission of testimony that he had stolen money from another drug suspect, Vincenzo Befi, one year earlier during a similar, unrelated patdown search to prove his intent to steal money from Villarmarin. Id., 374–75, 390–91. In concluding that the trial court improperly had admitted evidence of the defendant's prior alleged uncharged misconduct, we observed: "Befi's testimony that the defendant allegedly took some of [his] money during a search for illegal narcotics does not render it more or less likely that the defendant, during a subsequent, unrelated search of Villarmarin, had the specific intent to appropriate the money in Villarmarin's possession. If believed, Befi's testimony would establish that the defendant had searched him and that, during the course of that search, the defendant had taken some of the money in Befi's possession. This evidence tends to suggest only the likelihood of the defendant's actions with respect to Villarmarin, namely, the likelihood that he also searched and took money from Villarmarin. It does not, however, establish that he had the requisite state of mind when he engaged in that conduct." (Emphasis omitted.) Id., 395.

The present case is distinguishable from *Meehan* because the conduct at issue in that case, unlike the conduct in the present case, was "a common and routine police practice in which [the defendant] frequently was required to participate." Id., 396. Consequently, the prior misconduct in *Meehan* was not relevant to the defendant's intent to commit the charged crime because such searches were performed routinely by all police officers in the course of their normal duties, and, therefore, criminal intent could not be inferred from such a routine practice. See id.

Having concluded that Driscoll's testimony was relevant, we next consider whether its probative value was outweighed by its prejudicial effect. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Pena*, supra, 301 Conn. 675–76. Relevant evidence also may be unduly prejudicial when "the proof and answering evidence it provokes may create a side issue that will *unduly* distract the jury from the main issues," when "the evidence offered and the counterproof will consume an *undue* amount of time," and when "the defendant, having no reasonable ground to anticipate the evidence, is *unfairly* surprised and

unprepared to meet it." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 673, 31 A.3d 1012 (2011). "The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Pena*, supra, 676.

In the present case, we conclude that Driscoll's testimony regarding the defendant's misconduct in Rhode Island was not unduly prejudicial because it did not satisfy the well established criteria for exclusion on that ground. Peering into the windows of a stranger's home, repeated surreptitious glances to see if anyone is watching, and leaving the property upon becoming aware that one is being observed by a police officer are actions commonly associated with actual or potential misconduct and would not have distracted the jurors or aroused their emotions. In addition, the testimony did not consume an undue amount of time and did not unfairly surprise the defendant in light of the state's prior motion seeking to introduce it.

Moreover, there was other significant evidence before the jury implicating the defendant in the Stonington burglary, thus diluting any potential prejudicial effect of Driscoll's testimony regarding the defendant's conduct in Rhode Island. This included his observations that the defendant and Cote were driving a black Saab convertible with Massachusetts license plates, the defendant was a passenger, and the defendant was wearing a sweatshirt type of jacket, all of which were consistent with Wesson's observations in Stonington. In addition, the jury heard incriminating evidence describing footprints in the snow leading to the back door of the Stanton home, damage to the back door consistent with a break-in, the discovery of tools in the Saab convertible that could be used in a break-in, and a gemstone matching a missing gemstone in a piece of the stolen jewelry.

Finally, the court gave the jury detailed limiting instructions immediately after Driscoll's testimony describing what he had observed in Rhode Island and, again, in its final instructions, thus minimizing any potential prejudice. See footnotes 5 and 6 of this opinion. "[A] trial court's limiting instructions about the restricted purpose for which the jury may consider prior misconduct evidence serve to minimize any prejudicial effect that such evidence otherwise may have had

. . . ." (Internal quotation marks omitted.) *State* v. *Cutler*, 293 Conn. 303, 314, 977 A.2d 209 (2009). We therefore conclude that the Appellate Court properly determined that the trial court did not abuse its discretion in admitting Driscoll's testimony because the testimony was relevant and not unduly prejudicial.

## II

The defendant's second claim is that the Appellate Court improperly concluded that P.A. 09-138, § 2, did not apply retroactively because its provisions were ameliorative and intended to correct nearly three decades of legislative inaction. The defendant specifically claims that, because he committed the larceny before the passage of P.A. 09-138, § 2, but was convicted and sentenced thereafter, he should have benefited under the amelioration doctrine from the increase in the minimum value element of the second degree larceny statute from $5000 to $10,000, which would have resulted in a downgrade of the second degree larceny charge to third degree larceny and a reduction in his sentence.[7] He also claims that there was a clear legislative intent to apply the amendment retroactively and that retroactive application of the amendment would save the state money by reducing the costs associated with the incarceration and supervised release of prisoners. The state responds that adoption of the amelioration doctrine would impermissibly invade the province of the legislature. We agree with the state.

The following additional facts are relevant to our resolution of this claim. As previously noted, the defendant and Cote were tried together. The second count of the substitute information in both the defendant's and Cote's cases alleged that, on or about January 27, 2009, the defendant "did commit a larceny and the value of the property did exceed [$5000] in violation of [General Statutes (Rev. to 2009) §] 53a-123 (a) . . . ." After the close of the evidence, the defendant joined Cote in moving to strike the second count because the value of the stolen property was approximately $8000, but, by the time of the trial in March, 2010, the second degree larceny statute had been amended by P.A. 09-138, § 2, resulting in an increase in the minimum value of property stolen necessary to constitute the offense from $5000 at the time of the crime to $10,000. The trial court denied the motion, and the defendant and Cote subsequently were convicted of second degree larceny.

Although they had been tried together, the defendant and Cote filed separate appeals with the Appellate Court, which affirmed the trial court's judgments. *State* v. *Kalil*, supra, 136 Conn. App. 483; *State* v. *Cote*, 136 Conn. App. 427, 453, 46 A.3d 256 (2012). Upon the granting of certification, both the defendant and Cote appealed to this court. The defendant initially did not claim that P.A. 09-138, § 2, applied retroactively because he had not made that claim in the Appellate Court.[8]

Cote, however, had made such a claim, and, following its rejection by the Appellate Court; *State* v. *Cote*, supra, 441; he renewed the claim on appeal to this court. Thereafter, we granted the defendant's motion for permission to add a similar claim, specifically, whether the Appellate Court properly had determined that P.A. 09-138, § 2, did not apply retroactively. We now address that claim.

Whether P.A. 09-138, § 2, may be applied retroactively to crimes committed before its effective date of October 1, 2009, is a question of law over which we exercise plenary review. See, e.g., *State* v. *Nowell*, 262 Conn. 686, 701, 817 A.2d 76 (2003). "In criminal cases, to determine whether a change in the law applies to a defendant, we generally have applied the law in existence on the date of the offense, regardless of its procedural or substantive nature." *In re Daniel H.*, 237 Conn. 364, 377, 678 A.2d 462 (1996). This principle is derived from the legislature's enactment of savings statutes such as General Statutes § 54-194, which provides that "[t]he repeal of any statute defining or prescribing the punishment for any crime shall not affect any pending prosecution or any existing liability to prosecution and punishment therefor, unless expressly provided in the repealing statute that such repeal shall have that effect," and General Statutes § 1-1 (t), which provides that "[t]he repeal of an act shall not affect any punishment, penalty or forfeiture incurred before the repeal takes effect, or any suit, or prosecution, or proceeding pending at the time of the repeal, for an offense committed, or for the recovery of a penalty or forfeiture incurred under the act repealed."

The defendant argues that, despite the mandate of the Connecticut savings statutes, this court should adopt the amelioration doctrine and permit the retroactive application of P.A. 09-138, § 2, to the second degree larceny statute under which he was charged. The amelioration doctrine provides that "amendments to statutes that lessen their penalties are applied retroactively . . . ." *State* v. *Graham*, 56 Conn. App. 507, 511, 743 A.2d 1158 (2000); see also *Castonguay* v. *Commissioner of Correction*, 300 Conn. 649, 663, 16 A.3d 676 (2011) ("when [the] [l]egislature has amended [a] statute to mitigate [the] penalty for a crime, [the] new law applies to cases in which [the] defendant committed [the] crime before [the] amendment, but was sentenced after [the] amendment"), citing *In re Estrada*, 63 Cal. 2d 740, 745–46, 408 P.2d 948, 48 Cal. Rptr. 172 (1965). The defendant also cites cases from numerous other jurisdictions that have adopted the amelioration doctrine and argues that there is no basis, other than a desire for vengeance, not to apply retroactively the legislature's considered judgment effectively reducing the punishment for larceny in the second degree. We disagree.

We noted in *Castonguay* that "[t]his court has not previously held that ameliorative changes to criminal

statutes apply retroactively"; *Castonguay* v. *Commissioner of Correction*, supra, 300 Conn. 663 n.14; and we decline to do so in the present case because the doctrine is in direct contravention of Connecticut's savings statutes.[9] See *State* v. *Graham*, supra, 56 Conn. App. 511 (concluding that to adopt amelioration doctrine essentially would cause "court to intervene in the legislative process to nullify by judicial fiat the legislature's savings statutes"); see also *State* v. *Harris*, 198 Conn. 158, 168, 502 A.2d 880 (1985) (rejecting defendant's argument that he should not be prosecuted under statute in effect at time of crime but under amended statute and stating that, "[i]n order to accept the defendant's argument . . . [the court] would have to ignore the savings clause embodied in . . . § 54-194"); *State* v. *DeMartin*, 171 Conn. 524, 529, 370 A.2d 1038 (1976) ("[w]hen . . . a saving provision exists, a crime committed prior to the effective date of the repealing act remains punishable under the terms of the prior statute" [internal quotation marks omitted]); *State* v. *Pastet*, 152 Conn. 81, 85, 203 A.2d 287 (1964) ("[i]n the absence of any expressed legislative intent that [the public act] should apply retroactively, we dismiss this attempt by the defendant [to persuade the court otherwise] without further comment"); *Dortch* v. *State*, 142 Conn. 18, 29, 110 A.2d 471 (1954) ("[t]he legislature expressed no intent that [the amended statute] should operate retrospectively, and it has no retrospective effect"). There are limits to judicial authority in this context, and we agree with the United States Supreme Court that, "[w]hatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility . . . these are peculiarly questions of legislative policy." (Internal quotation marks omitted.) *State* v. *Darden*, 171 Conn. 677, 679, 372 A.2d 99 (1976), quoting *Gore* v. *United States*, 357 U.S. 386, 393, 78 S. Ct. 1280, 2 L. Ed. 2d 1405 (1958). Thus, although "the rule of separation of governmental powers cannot always be rigidly applied . . . it must be remembered that the constitution assigns to the legislature the power to enact laws defining crimes and fixing the degree and method of punishment and to the judiciary the power to try offenses under these laws and impose punishment within the limits and according to the methods therein provided." (Citation omitted.) *State* v. *Darden*, supra, 679–80. Accordingly, in light of Connecticut's savings statutes and the well recognized constraints placed on the exercise of judicial authority in fixing the degree and method of punishment, we decline to establish a new rule allowing application of the amelioration doctrine in Connecticut.

We also reject the defendant's vengeance argument. In addition to the fact that the savings statutes preclude judicial application of the amelioration doctrine in this jurisdiction, applying the doctrine could result in the unequal treatment of defendants who commit the crime

of second degree larceny on the same day but whose trials proceed at a different pace, thus resulting in some defendants being convicted under the law in effect at the time the crime was committed and others under the law enacted following commission of the crime. As another court similarly explained: "We cannot say that a legislature could not rationally conclude that the best approach would be a purely prospective one, so that all defendants who committed crimes before the statute became effective would be treated equally. Otherwise, sentencings could get caught up in manipulations with unfair results overall. Some convicted felons, for example, might be able to arrange sentencing delays to take advantage of the new sentencing scheme, whereas others could not achieve the same result before less sympathetic judges. But, more fundamentally, we see nothing irrational in a legislative conclusion that individuals should be punished in accordance with the sanctions in effect at the time the offense was committed, a viewpoint encompassed by the savings statutes themselves." *Holiday* v. *United States*, 683 A.2d 61, 78–79 (D.C. 1996), cert. denied sub nom. *Palmer* v. *United States*, 520 U.S. 1162, 117 S. Ct. 1349, 137 L. Ed. 2d 506 (1997). This court has also recognized that "[i]t is unlikely that the legislature would have intended for two similarly situated offenders to receive . . . disparate treatment solely on the fortuity of when their cases came to trial." *Johnson* v. *Commissioner of Correction*, 258 Conn. 804, 829, 786 A.2d 1091 (2002); cf. *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 499–500, 709 A.2d 1129 (1998) (if two constructions of statute are possible and one alternative produces likelihood of untenable or irrational results, more reasonable interpretation should be adopted). Accordingly, the defendant's vengeance argument has no merit.

The defendant further maintains that Connecticut's two general savings statutes do not bar the retroactive application of P.A. 09-138, § 2, because courts in other jurisdictions have held that general savings statutes do not preclude application of the amelioration doctrine when the governing criminal statutes do not contain specific savings clauses, and that the history of §§ 54-194 and 1-1 (t) demonstrates that the legislature enacted the statutes to negate the effect of the common-law abatement doctrine rather than to prevent ameliorative amendments from having retroactive application. We disagree. We do not find persuasive the decisions of other courts interpreting their savings statutes in light of their own unique state constitutional and jurisdictional constraints. See, e.g., *State* v. *Reis*, 115 Haw. 79, 90–91, 165 P.3d 980 (2007). With respect to the history of the Connecticut savings statutes, it is true that §§ 54-194 and 1-1 (t) were enacted in 1871 and 1881, respectively, to counter the effect of the common-law abatement doctrine. See *Simborski* v. *Wheeler*, 121 Conn. 195, 198–

99, 183 A. 688 (1936); see also Public Acts 1871, c. 107 (now codified as amended at § 54-194); Public Acts 1881, c. 1 (now codified at § 1-1 [t]). Nevertheless, the legislature has not seen fit to amend the statutes in any material respects for more than 130 years, even following this court's determination in various cases that the savings statutes do not allow for application of the amelioration doctrine except on a case-by-case basis when the legislative intent to do so is clearly expressed in the governing criminal statute. See, e.g., *State* v. *Harris*, supra, 198 Conn. 168. Accordingly, we reject both of the defendant's foregoing arguments.

The defendant finally contends that the legislative history of P.A. 09-138, § 2, suggests that the act should be applied retroactively. Although he acknowledges that neither P.A. 09-138, § 2, in its original form nor as subsequently codified at General Statutes (Supp. 2010) § 53a-123 indicates whether the provision was intended to be retroactive or prospective, he claims that the statute's legislative history demonstrates that it was intended to be retroactive. He relies for this conclusion on the Judiciary Committee's joint favorable report on House Bill No. 6576, 2009 Sess., which provides that an adjustment in the value element of the second degree larceny statute was being made to "more accurately reflect the actual values today," as compared to when the statute was "last updated in 1982 . . . ." Judiciary Committee, Joint Favorable Report, House Bill No. 6576, 2009 Sess. He also relies on the fiscal note attached to the bill providing that its passage would result in "potentially significant" savings in the costs of probation supervision and incarceration. Id. We disagree.

It is well established that "[t]he interpretation and application of a statute . . . involves a question of law over which our review is plenary." *State* v. *Heredia*, 310 Conn. 742, 755, 81 A.3d 1163 (2013). "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to

its relationship to existing legislation and common law principles governing the same general subject matter . . . . We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . ." (Footnote omitted; internal quotation marks omitted.) Id., 755–56.

In the present case, the effective date of P.A. 09-138, § 2, was October 1, 2009. This fact, and the absence of any express language in the provision referring to its retroactive application, indicates that the legislature intended P.A. 09-138, § 2, to be applied prospectively only. See, e.g., *Davis* v. *Commissioner of Correction*, 133 Conn. App. 458, 467, 37 A.3d 758 (2012) ("[t]he presumption that [a statute] has only prospective effect can be overcome only by a clear and unequivocal expression of legislative intent that the statute shall apply retrospectively" [internal quotation marks omitted]). If the legislature had intended P.A. 09-138, § 2, to apply retroactively to those who had committed the crime of second degree larceny prior to October 1, 2009, but had yet to be sentenced, it could have used "clear and unequivocal" language to evince such an intent. Id. Accordingly, there is no ambiguity in P.A. 09-138, § 2, that would require us to examine its legislative history to determine the legislature's intent. We therefore conclude that the Appellate Court properly determined that P.A. 09-138, § 2, did not apply retroactively.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER, McDONALD and VERTEFEUILLE, Js., concurred.

[1] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

[2] General Statutes (Rev. to 2009) § 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property . . . exceeds five thousand dollars . . . ."

[3] Section 2 of P.A. 09-138, entitled "An Act concerning Larceny," increased the value required for an offense constituting larceny in the second degree as follows: "(a) A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property . . . exceeds ten thousand dollars . . . ." P.A. 09-138, § 2, codified at General Statutes (Supp. 2010) § 53a-123 (a) (2). Thus, under the statutory scheme at the time of the defendant's conviction, the value of the property taken would have qualified for a charge of larceny in the third degree; see General Statutes (Supp. 2010) § 53a-124 (a) (2); a class D felony with a maximum sentence of five years; see General Statutes (Supp. 2010) § 53a-124 (c); General Statutes § 53a-35a (8); rather than a class C felony with a maximum sentence of ten years under the statute in effect at the time the crime was committed. See General Statutes (Rev. to 2009) § 53a-123 (c); General Statutes § 53a-35a (7).

[4] Although the defendant and Cote were tried together, they filed separate appeals.

[5] "The court [gave] the following . . . limiting instruction: The evidence offered by the state of alleged subsequent acts of misconduct by the [defendant] at [the Rhode Island property] is not being admitted to prove the bad character of . . . the [defendant] or . . . the defendant's tendency to commit a criminal act. This evidence is being admitted to show or establish the existence of . . . the defendant's intent on the charges of burglary and/or larceny, which is a necessary element of each of those crimes.

"It is also being offered to place in . . . context the events alleged to have occurred on the date in question. You may not consider such evidence

as establishing a predisposition on the part of [the] defendant to commit the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you conclude that such conduct occurred and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issue of intent or placing the events of the date in context.

"On the other hand, if you do not conclude that such conduct occurred, or, even if you do, if you find that it didn't logically, rationally, and conclusively assist on the issue of . . . intent or placing into context the alleged events that occurred on the date in question, you may not consider the testimony for any purpose . . . ." (Internal quotation marks omitted.) *State* v. *Kalil*, supra, 136 Conn. App. 462 n.7.

[6] "The court . . . [charged the jury after closing arguments as follows]: Any testimony or evidence which I identified as being limited to a purpose, you will consider only as it relates to the limits for which it was allowed, and you will not consider such testimony and evidence in finding any other facts as to any other issue.

"For example, the state offered evidence of the alleged act by . . . the [defendant], which occurred shortly after the act alleged to have occurred at the [Stonington property] . . . . The evidence offered by the state of subsequent acts of alleged misconduct by the [defendant] at or near [the Rhode Island property] was not admitted to prove the bad character of . . . the [defendant] or . . . the defendant's tendency to commit criminal acts. This evidence was admitted solely to show or establish the existence of . . . the defendant's intent on the charges contained in [the] information of burglary and/or larceny, which is a necessary element of each of these crimes. It was also offered to place into context . . . the events alleged to have occurred on the date in question.

"You may not consider such evidence as establishing a predisposition on the part of [the] defendant to commit the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you conclude that such conduct occurred and further find that it logically, rationally, and conclusively supports the issues for which it is being offered by the state, but only as it may bear on the issue of intent or placing the events of the date . . . into context.

"On the other hand, if you do not conclude that such conduct occurred, or, even if you do, if you find that it doesn't logically, rationally, and conclusively assist on the issue of intent or placing into context the events alleged to have occurred on the date in question, you may not consider this testimony for any purpose." (Internal quotation marks omitted.) *State* v. *Kalil*, supra, 136 Conn. App. 462–63 n.8.

[7] The statutory maximum for larceny in the third degree in effect at the time of the defendant's conviction was five years incarceration. See General Statutes (Supp. 2010) § 53a-24 (c); General Statutes § 53a-35a (8).

[8] The defendant specifically claimed that "(1) the [trial] court improperly admitted the testimony of [Driscoll] because the prejudicial effect of his testimony far outweighed its probative value, (2) there was insufficient evidence to prove that the defendant was guilty of burglary in the third degree or larceny in the second degree, and (3) the court improperly joined the defendant's trial with that of . . . [Cote's], when their defenses were mutually antagonistic." *State* v. *Kalil*, supra, 136 Conn. App. 456.

[9] Justice Eveleigh, in his concurring and dissenting opinion, disagrees with this conclusion, stating that "[the] savings statutes do not apply because we are not dealing with the repeal of a statute, as required by the savings statutes; rather, we are dealing with an amendment to a statute." Justice Eveleigh subsequently reiterates that, "[i]n the present case, the legislature did not expressly repeal the prior statute. Rather, it merely amended the monetary provisions that classified the degree of the crime." For all practical purposes, however, this is a distinction without a difference, because the legislature typically repeals an existing statute before enacting its replacement containing the amended language. See *State* v. *Kozlowski*, 199 Conn. 667, 675, 509 A.2d 20 (1986) ("[t]he legislature characteristically casts acts which alter language within existing statutory subsections in the form of repeal and substitution, reserving the label of amendment for acts which add entirely new subsections"). Furthermore, even if this was not the usual practice, the legislature in the present case repealed the existing second degree larceny statute in its entirety before replacing it with a nearly identical statute containing the change relating to the value of the property stolen necessary to constitute the offense. The introductory language of P.A. 09-138, § 2, specifically provides: "Section 53a-123 of the general statutes is

repealed and the following is substituted in lieu thereof (*Effective October 1, 2009*) . . . .” (Emphasis in original.) Accordingly, contrary to Justice Eveleigh’s claim, the legislature expressly repealed the prior second degree larceny statute before enacting the amendments contained in P.A. 09-138, § 2.

––––––––––––––––––––––––––––